IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FREDRICK GOINGS, M36022,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| **ANTHONY JONES,** | ) |
| **AARON J. CAMPBELL,** | ) |
| **JERRY L. WITTHOFF,** | ) |
| **C/O WINE,** | ) |
| **C/O POWELL,** | ) |
| **C/O DUMSTOREFF,** | )  Case No. 19-cv-888-DWD |
| **ROB JEFFREYS,** | ) |
| **C/O BRUMLOVE,** | ) |
| **C/O WHITE,** | ) |
| **C/O SCANLAN,** | ) |
| **REVA ENGELAGE,** | ) |
| **C/O ENGEBGE,** | ) |
| **HOOD,** | ) |
| **JACQUELINE LASHBROOK,** | ) |
| **MARY WILSON[1],** | ) |
| **ANTHONY WILLS,** | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

This matter is before the Court on Defendants' ("Defendants") affirmative defense that Plaintiff Fredrick Goings failed to exhaust his administrative remedies prior to filing this lawsuit as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). The Court held a *Pavey* hearing on July 11, 2023, to make findings about exhaustion in

---

[1] Defendant Mary Wilson was named in Claim 6, and she returned an executed waiver of service on November 18, 2021. (Doc. 25). After returning an executed waiver, counsel never appeared on Wilson's behalf, and she never filed an answer or otherwise participated in these proceedings. Because the facts that resolve Claim 6 against the other defendants named in association with that claim would be equally applicable to Wilson, the Court will also dismiss Claim 6 against Wilson for failure to exhaust.

this case. *See Pavey v. Conley*, 663 F.3d 899, 904 (7th Cir. 2011); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). At the hearing, the Court admitted the exhibits to the Motion to Supplement Defendants' Brief in Support of their Prior Motion for Summary Judgment on Exhaustion, so that Motion (Doc. 73) is granted. At the conclusion of the hearing, and after careful consideration of the evidence, the Court finds that Plaintiff failed to exhaust his administrative remedies, so Plaintiff's claims are dismissed for failure to exhaust pursuant to § 1997e(a).

## BACKGROUND

Plaintiff signed his complaint on August 9, 2019. (Doc. 1 at 40) Upon initial review, the Court allowed seven claims[2] to proceed:

| | | |
|---|---|---|
| Claim 1: | Eighth Amendment claim against Campbell, Witthoft, Wine, Powell, Dumstoreff and Brumlove for excessive force; |
| Claim 2: | State law assault and battery claim against Campbell, Witthoft, Wine, Powell, Dumstoreff and Brumlove; |
| Claim 3: | Eighth Amendment claim against White for failure to intervene or protect Plaintiff against excessive force; |
| Claim 4: | First Amendment retaliation claim against Campbell and Jones; |
| Claim 5: | Fourth and Eighth Amendment claims against Campbell, Witthoft, Wine, Powell, Dumstoreff and Brumlove for requiring him to strip; |
| Claim 6: | Eighth Amendment deliberate indifference claim against Lashbrook, Campbell, Jones, Reva Engelage, C/O Engebge, White, Scanlan, Hood, and Wilson; |

---

[2] The Order of Initial Review (Doc. 22) identified eight claims to proceed: Claims 1, 2, 3, 4, 5, 6, 7 and 8. It dismissed claims 9-12. Upon later review, the Court recognized that Claim 7 should not have been allowed to proceed based on the substantive analysis in the Order of Initial review, and that it was only allowed to proceed based on typographical error. (Docket entry 35). The Court corrected the error February 9, 2022, by dismissing Claim 7.

      Claim 8:      State law defamation claim against Campbell and Witthoft for writing false disciplinary charges.

(Doc. 22 at 5; Docket entry 35).

The following basic factual allegations from the complaint provide context for the consideration of the defense of failure to exhaust administrative remedies. Plaintiff's claims are premised on his allegation that on January 1, 2019, he was moved to a new cell, and immediately upon arrival at the cell the tactical team arrived and sprayed him with a toxic chemical spray. (Doc. 1 at 13-15). He was escorted to another room where he was assaulted and forced to strip. (Doc. 1 at 15-16). Defendants Campbell, Witthoft, Wine, Powell, Dumstoreff, and Brumlove allegedly participated in this saga. (Doc. 1 at 16, 33). After these events, he was forced to stand half-dressed in front of Defendants Reva Engelage and Mary Wilson, who were healthcare workers. (Doc. 1 at 17). Plaintiff was returned to his cell in a rough manner while Defendant White observed. (Doc. 1 at 18).

Plaintiff informed Defendants Campbell, Jones, Reva Engelage, Engebge, Hood, Wilson, White, and Scanlan that he needed healthcare and wanted to see a Prison Rape Elimination Act (PREA) coordinator, to no avail. (Doc. 1 at 18, 28). Plaintiff alleges his head was bruised and swollen. (*Id.* at 18). He got healthcare and spoke to officials on January 8, 2019. (*Id.* at 19).

Also related to these events, Plaintiff was involved in disciplinary proceedings, but his legal claims related to the disciplinary proceedings were dismissed at initial review.

After reviewing Plaintiff's grievance documentation, the Defendants' moved for summary judgment on the premise that Plaintiff failed to exhaust his administrative remedies. (Docs. 42, 43). In support of their motion, they contended that there was only one potentially relevant grievance—447-1-19—which was not sufficient to exhaust the claims against them. They submitted grievance documentation, an "IGRV" log (which is a log of grievance documentation received by the Administrative Review Board), and a one-page log of internal grievance records from Menard. In response to summary judgment, Plaintiff contended that grievance 447-1-19 was sufficient to exhaust his administrative remedies, and he also argued he had submitted 3 additional grievances that went missing. He supported his response with a signed declaration.

The Court determined on the parties' briefing that grievance 447-1-19 was not sufficient to exhaust administrative remedies as to any of the claims pending in this lawsuit, but it also determined there was a genuine dispute of fact about the existence of the three 'missing' grievances. (Doc. 61). The Defendants' requested a hearing, and the Court initially set a hearing for April 11, 2023. (Docs. 63, 64). Plaintiff filed a motion in limine wherein he sought to bar the introduction of new evidence at the Pavey hearing, but the Court denied his motion as the relief requested would have unduly limited the scope of the hearing. (Docs. 66, 67). To encourage the parties to better prepare for the hearing, the Court issued a scheduling order that required the exchange of witness and exhibit lists. (Doc. 67). The hearing was subsequently re-set a few times to accommodate the Court's trial schedule, and to secure the availability of witnesses. The hearing was ultimately held by videoconference on July 11, 2023.

## FINDINGS OF FACT

As the Court found upon review of the Motion for Summary Judgment on Exhaustion (Docs 42, 43), there are three 'missing' grievances that are potentially relevant to exhaustion in this lawsuit. Plaintiff alleged in his signed complaint, in his declaration in response to summary judgment, and at the Pavey hearing, that he attempted to file grievances on January 1, January 26, and February 13, 2019, concerning the incidents presented in this lawsuit. Defendants counter that there was never any official record of these grievances, and the grievances do not exist.

Defendants submitted a November 1, 2018, bulletin, which states that effective December 1, 2018, grievances will be collected either via locked wooden boxes mounted in the housing units, or via locked portable boxes brought around daily to offenders unable to access the permanent boxes. (Doc. 73-1 at 1). Grievances placed in the boxes will be logged by staff, and within 48 hours of receipt of a grievance (excluding weekends or holidays) a staff member will make an entry of each received grievance in the CHAMP system. Offenders will receive a copy of the CHAMP entry via institutional mail. If an offender does not receive a CHAMP entry, he may inquire about the status of his grievance. (Doc. 73-1 at 1-2).

Defendants also submitted Plaintiff's grievance file from approximately 2018 to 2022. The file contained approximately 400 pages of grievances, none of which correspond to the January 1, 26, or February 13, 2019 grievances at issue at the Pavey hearing. (Docs. 43-1 – 43-4). Defendants also submitted Plaintiff's internal grievance log for Menard in 2019 which reflects four grievances submitted at Menard in 2019. (Doc. 43-

4 at 1). The log reflects the January 22 emergency grievance (416-1-19) mentioned in the counseling summary. It also reflects grievance number 447-1-19, and two grievances about contaminated food trays. The only grievance that was processed through all levels of review and signed by the Chief Administrative Officer (CAO) was grievance 447-1-19. (*Id.*). The Defendants also submitted Plaintiff's grievance records from the Administrative Review Board, which did not show an appeal that correlated with the three grievances at issue at the Pavey hearing. (Doc. 43-1 at 1-5).

To further demonstrate that Plaintiff failed to exhaust his administrative remedies in this case, the Defendants called Kelly Pierce, a grievance counselor at Menard. Ms. Pierce testified that she has been a Grievance Officer at Menard for the past seven years. In 2017, Menard and Stateville participated in a grievance pilot program described in a November 1, 2018, bulletin. (Doc. 73-1). Per the bulletin, grievances were to be placed by inmates in a locked box on the wall of their cellhouse, or in a portable locked box brought around restricted housing units. A grievance placed in the box is retrieved by a counselor in the cellhouse, or by a grievance officer from the portable boxes. Upon retrieval, the counselor or grievance officer stamps a grievance, assigns it a grievance number, notes receipt in the internal grievance log, notes receipt in the cumulative counseling summary, and generates a CHAMP receipt to transmit to the inmate. If an inmate has not received a CHAMP receipt within 48 hours (excluding weekends or holidays), he may request the status of a grievance. Pierce further testified that inmates were notified of the grievance pilot program, and then of the official change to the grievance procedure detailed in the November 1, 2018, bulletin, in multiple ways. The

information was posted on cellhouse bulletin boards, it was on the inmate television channels, it was available from the prison law libraries, and it was included in the prison orientation manual.

Pierce also testified about the internal grievance logs kept at Menard. (Doc. 73-2). Specifically, she testified that each grievance received is assigned a number, it is stamped, and it is catalogued on the log based on the contents and the type (emergency or non-emergency) of relief sought. The log contains information such as the date the grievance is received, who it is sent to for processing, what date the inmate received a receipt, and any details about second level review, or a later appeal. Specific to this case, Pierce testified that Plaintiff's grievance log from Menard in 2019 reflected the submission of four grievances. She testified that to her knowledge, the log was complete and accurate. (Doc. 43-4).

In addition to describing the grievance process and Menard's internal grievance log, Pierce also testified about cumulative counseling summaries. A cumulative counseling summary contains information about a particular inmate throughout the course of incarceration. The summary may include records for grievances, or interactions between inmates and counselors, among other things. Specific to this case, Pierce testified that there was a note in Plaintiff's cumulative counseling summary that indicated on January 11, 2019, a counselor responded to Plaintiff's inquiry about pending grievances by sending him a memo that listed all grievances from December 1, 2019, to January 11, 2019. (Doc. 73-2 at 5). Pierce explained that by requesting a status update on pending grievances, an inmate could track a grievance if he believed a grievance was lost or

misplaced and he could resubmit it. On cross-examination Pierce testified that, although an inmate may not request a copy of the cumulative counseling summary directly, he can get updates on grievances such as the memorandum transmitted on January 11, 2019.

Pierce testified that based on her personal experience as a grievance counselor for seven years, grievances do not get lost or go missing often. She testified that she always processes grievances in the exact same way, and that she devotes thorough attention to the task of logging grievances from the grievance box. Pierce testified that she could make data entry mistakes when logging grievances, but because grievances are logged in multiple ways, a mistake would be unlikely to implicate an entire grievance. An example might be an improper date assigned, or an improper code or character recorded, but not something that impacted the entire grievance and all records of it. If an inmate believes a grievance is missing, the recourse is to inquire about the status and to resubmit the grievance. Pierce also testified that counselors walk the cellhouse every 30 days, and an inmate could talk to a counselor if he was concerned about a lost grievance.

Pierce also testified that the keys to the grievance boxes are held by counselors or grievance officers, and if a key was lost there would be a paper trail and an institution wide effort to locate a lost key.

Defendants also provided a cumulative counseling summary for Plaintiff that contains entries from January 2019-late June 2019. (Doc. 73-2). There is a notation on January 2, 2019, of the receipt of a medical grievance. (*Id.* at 5). During a January 9, 2019, gallery tour, Plaintiff inquired about his "BStriper" status and handed the counselor 2 papers with lengthy requests, his name was also submitted to medical, and mental health,

and he was to be considered for double cell placement. (*Id.*). On January 11, 2019, a grievance officer received a kite from Plaintiff about the status of grievances received, and she responded with a list of all grievances received. (*Id.*) On the same date, there is an entry addressing the handwritten requests that were apparently handed to the counselor during the January 9, 2019, gallery tour.

On January 22, 2019, the counseling summary reflects an emergency grievance (#416-1-19) about a final summary for a January 8, 2019, hearing. (Doc. 73-2 at 4). On January 23, 2019, the summary reflects the receipt by the grievance office of grievance number 447-1-19. On February 4, 2019, the summary indicates the grievance office received grievance 447-1-19 for second level review.

On February 8, 2019, Plaintiff was seen face-to-face during a gallery tour. (Doc. 73-2 at 4). He inquired about the status of "multiple grievances – written on the 25th and 26th." The counseling summary indicates, "per G. Office – they do not have any grievances date the 25th or 26th this month (only emerg. Grievance is about not receiving a final summary)." (Doc. 73-2 at 4). On March 7, 2019, there was another gallery tour, at which time Plaintiff stated he did not want to do a long-term segregation review at his cell front, and he stated he inquired about some supplies (seg pens, thermals, etc.).

At the hearing Jacob Scanlan (a former correctional officer who was promoted to sergeant) was called to testify by Plaintiff and was questioned by both sides. Scanlan testified that he worked the 3-11 shift in the North 2 cellhouse at Menard. He had no recollection of interacting with Plaintiff during this shift, or at Menard. As a part of his work, Scanlan testified that he rolled the portable grievance box around the unit so that

inmates could deposit grievances. Grievance collection was always performed during the 3-11 shift, and the box was circulated once a day. To collect a grievance, the officer would unlock the chuckhole so that an inmate could place his grievance directly in the box. Scanlan did not have access to the contents of the box.

Plaintiff asked if Scanlan ever refused to open the chuckhole, and instead had an inmate slide a grievance thru the crack in the door so that he could place it in the box, but Scanlan indicated that was against procedure and that he would not have done so. Scanlan indicated that there was never a time that officers would refuse to open the chuckhole for institutional security or otherwise because the chuckhole was needed to pass things like food and medication.

Correctional Officer John Caraway was also called by Plaintiff and questioned by both sides. Caraway testified that he worked at Menard for three-and-a-half years, and during that time he was assigned to the day shift from 7 to 3 in the North 2 cellhouse. He worked that shift five days a week, with Monday and Tuesday off each week. Prior to working in the North 2 segregation house, Caraway only ever worked the 3 to 11 shift on three occasions. He never worked the 3 to 11 shift in North 2. He further testified that if he worked any overtime in North 2, it was limited to certain tasks, and hours. Caraway indicated that he never collected grievances during his time working in North 2, and he would not have done so even if he worked overtime because that was not a task performed by overtime staff. Caraway did not recall ever personally interacting with Plaintiff or taking a grievance from him.

At the hearing, Plaintiff also testified on his own behalf. He testified that on January 1, 2019, Scanlan gave him a disciplinary ticket. Upon receipt of the ticket, he composed an eight-page grievance that described an attack by the orange crush tactical unit, the grievance detailed the attack and his assailants. On the same date, Scanlan opened the chuckhole on his cell and Plaintiff placed the grievance in the locked grievance box. He contacted staff on or around January 11, 2019, to learn the status of his grievance, but he got no response. On January 26, 2019, he prepared a duplicate eight-page grievance, which concerned the attack as well as subsequent disciplinary proceedings. On that date, Scanlan refused to open the chuckhole and instead instructed Plaintiff to slide the grievance through a crack in the door to be placed in the grievance box. Scanlan showed that he placed the grievance in the portable box, and he rolled it away from the cell. On February 13, 2019, Plaintiff testified that Caraway was working the 3 to 11 shift. He asked Caraway to get the portable grievance box. Caraway returned with the box, but because he did not have a key for Plaintiff's chuckhole, he instructed Plaintiff to slide his grievance through a crack in the door. Plaintiff slid a two-page grievance thru the crack, and he watched Caraway place it in the box.

Plaintiff further testified that after these occurrences, he spoke to his counselor and asked her to follow-up on his grievances, but she never responded. He further testified that he wrote the warden about the grievances to no avail. After receiving no responses from administration, he composed duplicates of the three grievances and transmitted them to the Administrative Review Board (ARB) with a letter. He waited for a response,

but never got one. Plaintiff testified that in August of 2018 he transferred from Stateville to Menard.

CONCLUSIONS OF LAW

A. **Legal Standards**

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008). "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). "At *Pavey* hearings, judges may hear evidence, find facts, and determine credibility. After finding facts, the district court may allow a claim to proceed or dismiss it for failure to exhaust." *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018) (internal citations omitted).

For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024. As an inmate in the Illinois Department of Corrections (IDOC), Plaintiff must follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, et seq. (2017). Under IDOC's procedure, an inmate initiates a grievance with his counselor, and he may then submit his grievance to a grievance officer at his facility, and to the CAO at his facility. If an inmate is unsatisfied with the outcome at the facility he must appeal to the ARB within 30 days. 20 ILL. ADMIN.

CODE § 504.850(a). However, "if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting," then the grievance procedure becomes unavailable. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (finding that an inmate who placed a timely ARB appeal in his chuckhole for mailing, but whose grievance was apparently lost, did all that he could to follow exhaustion procedures).

Whether a claim has been exhausted pursuant to § 1997e(a) is a determination for a judge—not a jury—to make. *Pavey v. Conley*, 544 F.3d 739, 741-42 (7th Cir. 2008). If a *Pavey* hearing is held due to an issue of fact about exhaustion of administrative remedies, the court hears evidence, finds facts, and determines credibility. *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018). The burden of proof is on the defendants to demonstrate that the prisoner failed to exhaust available administrative remedies. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). Generally, a defendant will need to do more to carry the burden than plainly alleged that no grievance exists, a defendant might meet said burden by submitting additional evidence such as grievance logs, counseling summaries, or evidence about the routine function of the grievance procedure. *See e.g., Daniels v. Prentice*, 741 Fed. App'x 342, 343-44 (7th Cir. 2018) (not published in the Federal Reporter) (finding that a defendant met her burden to show a lack of exhaustion by submitting records of an inmate's grievance activity, the inmate's counseling record, and affidavits on the prison grievance procedure to contradict the plaintiff's own testimony about grievances that allegedly went missing).

  B. Analysis

The Court held a *Pavey* hearing in this matter to find facts and to review the credibility of the witnesses. Plaintiff maintained that he attempted to submit relevant grievances on January 1, 2019, January 26, 2019, and February 13, 2019, but he never received a response to these grievances either at Menard or from the ARB. Based on the evidence presented, the Court finds that the grievance process was available, but that Plaintiff failed to exhaust administrative remedies.

Both the documentary and testimonial evidence from Defendants establish that the grievance process was available and functioned in a routine fashion, but officials did not receive a grievance from Plaintiff concerning the claims in this case. Specifically, the internal grievance log from Menard reflects only four grievances filed at Menard in 2019, none of which concern the allegations in this lawsuit.[3] Plaintiff's grievance files tendered by the Defendants in support of their motion for summary judgment (Docs. 43-1 – 43-4), and the cumulative counseling summary tendered for the Pavey hearing (Doc. 73-2), further establish that the institution did not receive a grievance from Plaintiff in January or February of 2019 concerning the claims in this case. Plaintiff's grievance records show that he routinely used the grievance process, and that he often did so through all the relevant levels for full exhaustion.

---

[3] There were two grievances received by the grievance office in January of 2019. The first concerned a disciplinary summary from a disciplinary hearing on January 8, 2019, but that grievance was not exhausted beyond emergency review. (Doc. 43-4). The second concerned commissary, legal property, and segregation time. The Court already determined that the second grievance (447-1-19) was insufficient to exhaust any of the claims presented in this lawsuit. (Doc. 61).

At most, the cumulative counseling summary shows that between January 9 and January 11, 2019, Plaintiff sought the status of pending grievances, and he received a responsive memorandum that listed all pending grievances. (Doc. 73-2 at 5). The cumulative counseling summary further shows that on February 8, 2019, Plaintiff inquired about multiple grievances allegedly written on January 25 or 26 but was informed that no such grievances had been received. (Doc. 73-2 at 4). The cumulative counseling summary also details the receipt and handling of grievances that appeared on the Menard internal grievance log for 2019. In addition to Menard's internal documentation, Defendants also submitted grievance logs from the Administrative Review Board that do not reflect receipt of any appeals relevant to this case. (Doc. 43-1 at 4-5).

Witnesses Kelly Pierce, Jacob Scanlan, and John Caraway all testified credibly about the routine function of the grievance procedure at Menard in early 2019. Specifically, Scanlan testified that on the 3 to 11 shift an officer would roll the portable grievance box thru the housing unit, and he or she would open the chuckhole for any offender who wished to place a grievance in the box. Both Scanlan and Pierce indicated that it was policy for grievances to be placed directly into the box by the inmate, so a staff member would not take a grievance from an inmate's hand and place it into the box for him. When asked if there was ever a reason he could not or would not open the chuckhole, Scanlan credibly indicated there was never any such reason. Scanlan testified that he did not recall interacting with Plaintiff or collecting a grievance from him, and he

testified he would not have had Plaintiff pass a grievance thru the cell door. Scanlan also indicated he did not have access to keys for the grievance box.

Kelly Pierce indicated that the portable grievance boxes were brought to the grievance office to be emptied by grievance officers or their staff. The boxes were always emptied in the same way, and she and other employees took care to focus solely on that task when they personally performed it. As grievances are removed from the box, they go through multiple steps. A grievance is stamped and assigned a number, it is sorted, it is logged both in the internal grievance log and the cumulative counseling summary, and a CHAMP receipt is returned to the inmate. Although a data entry error could occur, she testified credibly that it did not happen often, and that an error would be unlikely to implicate a whole grievance. For example, she testified that a grievance may get labeled with the wrong date, or there might be a typographical error, but she did not think an error would infect the whole process. She also testified that in her seven years of experience, lost or missing grievances were rare.

In relation to this specific case, Pierce testified that the Menard internal grievance log reflected just four grievances filed by Plaintiff in 2019. She further testified that Plaintiff's cumulative counseling summary showed that when he asked about the status of grievances on January 11, 2019, the grievance office responded with a memo that listed the status of all grievances filed from December 1, 2018, to that date.

Between the grievance documentation and Pierce and Scanlan's credible testimony about the routine function of the grievance process, the Court finds that Defendants carried their burden to show that the grievance process was available but that

Menard grievance officials did not receive any relevant grievances from Plaintiff in January or February of 2019. Defendants have credibly established that Plaintiff failed to exhaust his administrative remedies as to the claims remaining in this lawsuit. Plaintiff attempted to discredit this showing by his own testimony, and through is examination and cross-examination of the witnesses, but the Court was not persuaded by Plaintiff's presentation.

As to Plaintiff's own testimony, he stated that he personally placed the January 1, 2019, grievance directly in the box when Scanlan wheeled it around, and that he passed the January 19 and February 13, 2019, grievances through the door to Scanlan and Caraway, respectively. He testified that he observed both officers place those grievances directly in the locked box. His testimony was contradicted by Scanlan's testimony that he never would have accepted a grievance by hand, and by Caraway's testimony that he never collected grievances in the restrictive housing unit. Additionally, Scanlan testified that he did not have keys to the grievance box. In order to credit Plaintiff's version of events—the Court would have to disbelieve Scanlan and Caraway, and it would have to find some explanation for three grievances being placed in a locked box but later coming up missing.

Perhaps in an effort to find an explanation for the three alleged 'missing' grievances, Plaintiff questioned Pierce at length about the processing of the grievances, but his line of questioning came across as more of a hypothetical inquisition into what could go wrong, than an effort to establish what actually occurred in this specific case. Plaintiff harped on the fact that data entry errors could occur, but the Court was

persuaded by Pierce's testimony that while errors certainly can and do occur, it would be unlikely that an error would infect an entire grievance.  Not only does Plaintiff ask the Court to believe that errors infected one grievance—he asks the Court to believe that errors somehow infected three entire grievances, and a transmission to the ARB. While the Court is mindful that the burden is not the Plaintiff's, it cannot help but to observe that, despite alleging that he handprinted copies of the three lost grievances and transmitted them to the ARB, Plaintiff did not have a shred of documentary evidence to support his testimony.  Furthermore, the ARB records that Defendants tendered in support of their motion for summary judgment show no record of Plaintiff's transmission to the ARB.  (Doc. 43-1 at 4-5).

To the extent that Plaintiff had one, or even a few grievances that somehow were not logged, the Court also notes that Plaintiff was able to learn of this issue by requesting a status on pending grievances, and in fact, he used this process on at least two occasions. During his cross-examination of Pierce, Plaintiff asked questions that seemed intended to demonstrate he could not have received notice of the November 1, 2018, grievance process bulletin—but this line of questioning is discredited by the evidence, which shows that Plaintiff asked for a status on his grievances on multiple occasions.  With the ability to ask for a status update, and with documented responses to his request for a status update in the cumulative counseling summary, the evidence shows that even if Plaintiff somehow had a few grievances get entirely lost, he was made aware of this issue with ample time to resubmit the grievances.  The Court also notes that Plaintiff was no stranger

to the grievance process, and his grievance file contained multiple fully exhausted grievances. (*See e.g.*, Doc. 43-1 at 16-19; Doc. 43-3 at 45-51).

Viewing the evidence as a whole, and with the benefit of a hearing to assess witness credibility, the Court is convinced that Plaintiff failed to exhaust his administrative remedies in this case. The time for exhausting remedies about the events that gave rise to this lawsuit has long since expired, so there is nothing Plaintiff can now do to revive his claims. Accordingly, Plaintiff's § 1983 claims (Claims 1, 3, 4, 5, 6) are dismissed without prejudice for failure to exhaust administrative remedies.

The Court notes that this still leaves two state law claims (Claims 2 and 8), for which exhaustion of administrative remedies under the PLRA is not required. *See* 42 U.S.C. § 1997e(a); *McDaniel v. Meisner*, 617 Fed. Appx. 553, 556 n.3 (7th Cir. 2015) (not selected for publication) (PLRA exhaustion requirements do not apply to state law claims). Because there are no remaining federal claims, the Court declines to exercise supplemental jurisdiction over these claims. *See e.g.*, 28 U.S.C. § 1367(c)(3) (a court may decline to exercise supplemental jurisdiction over any state-law claims if it has dismissed all claims over which it has original jurisdiction); *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (although the decision to relinquish supplemental jurisdiction is discretionary, when all federal claims are dismissed before trial it is presumed that the court will relinquish jurisdiction over any state law claims).

## DISPOSITION

Defendants' Motion to Supplement (Doc. 73) is **GRANTED**. Plaintiff Fredrick Goings' pending claims (1, 3, 4, 5, and 6) are **DISMISSED without prejudice** for his

failure to exhaust administrative remedies as is required by 42 U.S.C. § 1997e(a). The Court declines to exercise supplemental jurisdiction over the state law claims (Claims 2, and 8), so these claims are also **DISMISSED without prejudice for lack of jurisdiction**. The Clerk of Court is **DIRECTED** to **CLOSE** this case and to enter judgment accordingly.

**IT IS SO ORDERED.**

Dated: July 18, 2023

_____
DAVID W. DUGAN
United States District Judge

### NOTICE

If Plaintiff wishes to contest this Order, he can either file a motion under Federal Rules of Civil Procedure 59(e) or 60(b), or he can appeal to the Seventh Circuit Court of Appeals within 30 days of the judgment or order appealed from, FED. R. APP. P. 4(a)(1)(A). The grounds under Rules 59(e) and 60(b) are quite narrow. For example, newly discovered evidence that was not previously available is a basis for relief under either rule, as is a manifest error of law. These rules are not intended as a forum to rehash previously considered arguments. If Plaintiff chooses to appeal to the Seventh Circuit Court of Appeals, he must file a notice of appeal in this Court, and he must pay a filing fee of $505, or apply for in forma pauperis (IFP) status. FED. R. APP. P. 3(a), 3(e). An IFP application must be accompanied by a prison trust fund account statement, as well as an outline of the issues to be presented on appeal. FED. R. APP. P. 24(a)(1)(C). If IFP status is granted, Plaintiff will be assessed a partial filing fee, with the balance due and owing over time regardless of the outcome of his appeal.